890

## KELLY et al. v. ANAHEIM FIRST NAT. BANK et al.

### No. 9020.

Circuit Court of Appeals, Ninth Circuit.

Dec. 1, 1939.

Rehearing Denied Jan. 2, 1940.

Edward C. Purpus, of Los Angeles, Cal., for appellants.

Isidore B. Dockweiler and Henry I. Dockweiler, both of Los Angeles, Cal., George P. Barse, of Washington, D. C., and J. L. Robertson, of Modesto, Cal., Attys. for Comptroller of the Currency, for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellee is a national banking association and appellants are certain of its stockholders.

In January, 1934, the bank was declared insolvent by the Comptroller of the Currency and one J. V. Hogan was appointed as receiver. Afterward the appellants severally presented to the receiver claims for sums of money which they had paid into the bank under circumstances presently to be stated. The receiver appears to have rejected the claims, or at any rate they were not paid. Suit was begun by appellants in January, 1936, for the recovery of the amounts, and the appeal is from a judgment denying recovery.

The complaint alleges that in June, 1931, a depreciation existed in the bank's bond account, and at that time appellants, with other shareholders, entered into an agreement with the bank whereby they agreed to purchase from the latter the depreciation in that account; and that "by the terms of the said agreement the said bank agreed to pay * * * to the aforesaid parties * * * any pro-rata decrease which might from time to time appear in the said depreciation of the said bond account." It is alleged that the amounts agreed upon were paid to the bank; that Hogan, upon his appointment as receiver, took possession of all the assets of the bank, including the bond account, and liquidated the same. Further, that by reason of the appointment of the receiver and the liquidation of the bank's assets, including the bond account, the consideration for the payments made by appellants wholly failed, and that the bank became and is now indebted to appellants in the amounts paid in.[1]

It appears from the evidence that in June, 1931, the capital of the bank had become impaired because of depreciation in the value of the securities owned by the institution. The directors at that time appointed a committee to collect $175 a share from the stockholders to be used "to purchase depreciation in the bond account." The subscription document circulated among the stockholders was worded as follows:[2]

"In compliance with action of the Board of Directors taken at a meeting held June 18, 1931, recommending that stockholders pay into a fund for the purchase of bond depreciation a sum equal to $175.00 for each share owned, the undersigned hereby subscribe to such fund in the amount set opposite our names.

"It is the intention that interest received from bonds equaling the amount of depreciation purchased be set aside for the use of the undersigned. The appraisal of the bond list shall be made each six months and

---

[1] Two of appellants are alleged to have made their contributions in the form of notes, which are asked to be canceled.

[2] No copy of this document appears to have been submitted to the Comptroller.

should a decrease in the depreciation be shown, the amount shall be divided prorata among the stockholders who purchased depreciation in bond account." (Then follow signatures and sums).

It is the amounts so subscribed that are sought to be recovered in this action.[3]

In July, 1931, the board resolved that the amounts paid in by the stockholders, together with a certain fund held in the bank's reserve account, be applied to take up five stockholders' notes of $6,000 each which had been placed in the bank's assets in 1930 to remedy an earlier impairment, "the balance of said amount to be applied directly against the bond account of this bank on account of estimated depreciation, which will reduce the present total of bond account by $110,650.00." Under date of August 20, 1931 the Deputy Comptroller wrote the board stating that a capital impairment in excess of $94,000 was shown by the June examination, which impairment the officer understood had been provided for by voluntary and unconditional contributions of directors and stockholders. The amount of the reported contributions was specified in the letter. The communication closed with the statement: "Although you have been previously advised in this regard this office wishes to bring to your attention again at this time the fact that contributions made to restore capital should be made unconditionally and without expectation of reimbursement.[4] Please advise in your reply to this letter that you have the correct understanding in this regard."

On September 8, 1931 the president of the bank replied, saying that the estimated amount of the capital impairment had resulted from a depreciation in the bond account, and that certain named stockholders had purchased the depreciation with the understanding that the bonds were to be held or exchanged "with a view of the same liquidating the amount subscribed." Under date of October 30, 1931 the Deputy Comp-

troller again wrote the board in part as follows: "Referring to the president's letter of September 8 * * * It should be clearly understood by all parties concerned that these contributions are voluntarily and unconditionally made, with no expectation of reimbursement from the profits or earnings of the bank."

In the minutes of the board under date of November 19, 1931, is an entry to the effect that this letter of the Comptroller was read and it was directed that a reply be made thereto. The reply merely advised the Comptroller that his letter had been read to the board at its meeting of November 19. At the annual meeting of the stockholders held in January, 1932, it was resolved "that all and singular actions of the officers of the bank for the past year be and they are hereby ratified, confirmed and approved."

The arrangement between the bank and the contributing stockholders was not followed up by the earmarking of any of the bonds. The records thereafter showed no segregation of them, nor were any lists made each six months or at other stated intervals as contemplated in the subscription paper. The bond account was kept the same after the transaction as before.

We need not determine whether the contract pleaded was valid, or whether, as the trial court found, all parties acquiesced in the requirement of the Comptroller that the payments were to be treated as voluntary contributions to capital, without any obligation of repayment. Nor need we consider questions of estoppel urged by appellee.

Assuming that there was an enforceable agreement to repay the contributions if the bonds appreciated in value, there was no "failure of consideration" for it, and no frustration of the contract through the ultimate closing of the institution by the Comptroller. The bank remained open for

---

[3] The total amount paid in by all stockholders subscribing was $115,650.

[4] In 1930 the capital of the bank had become impaired because of a similar depreciation in the bond account, and certain of the stockholders and directors had placed their personal notes in the bank's assets to remedy the impairment. At that time the Deputy Comptroller had advised the board by letter that "an impaired capital may be restored in the manner prescribed by Section 5205 involving an assessment of the stock. If restoration of the capital in the manner provided by that section is not desired, restoration may be accomplished through voluntary and unconditional contributions to the bank, or by the purchase for cash of the assets estimated by the examiner as losses. Contributions of cash or purchases of assets to eliminate an impairment of capital must, however, be unconditional and there must be no obligation on the part of the bank to repay the contribution or to repurchase the assets should they prove uncollectible."

well over two years after the money was paid in. An appreciation was not guaranteed and there was no promise on the part of the bank to continue as a solvent concern until, if ever, an appreciation occurred. The agreement was subject to the condition, necessarily implied, that there would be no further liability on the part of the bank in the event it became insolvent and its bonds and other assets had to be liquidated—none, at any rate, beyond the possible liability to account for intervening appreciation. No construction more favorable to appellants can rationally be given such a contract.

It was not shown that the bonds, as a whole, appreciated in value. On the contrary, the bond account appears to have been in a worse condition when the receiver took over, and when he later disposed of the assets, than it had been when the agreement was made. Thus even if this were an action for an accounting, which it is not, there was no basis in the proof for any recovery.

Affirmed.